**UNITED STATES of America,
Plaintiff,**

v.

**W.D. MASK, III, Mask Cotton
Company, Inc., Defendants.**

No. 99–20260 D.

United States District Court,
W.D. Tennessee,
Western Division.

July 9, 2001.

Michael J. Stengel, Stengel Law Firm, Memphis, TN, Daniel A. Clancy, Law Office of Daniel A. Clancy, Jackson, TN, for William Dunavant Mask, III(1), defendant.

William Dunavant Mask, III, Germantown, TN, pro se.

Daniel A. Clancy, Law Office of Daniel A. Clancy, Jackson, for W.D. Mask Cotton Company (2), defendants.

## MEMORANDUM OPINION

DONALD, District Judge.

On November 18, 1999, a grand jury, pursuant to 18 U.S.C. §§ 287, 1001, 1341, and 1343, indicted Defendants W.D. Mask, III and Mask Cotton Co., Inc. ("Masks") for engaging in fraudulent activities relating to trading cotton between November 1, 1994 and May 25, 1995. Defendants move to dismiss their indictment, asserting that, because Plaintiff United States has purposely engaged in pre-indictment delay, Defendants have been so prejudiced that the Due Process Clause requires dismissal of the charges. The Court has jurisdiction under 18 U.S.C. § 3231. For the reasons herein, the Court **DENIES** Defendants' motion to dismiss for pre-indictment delay.

### I. Factual background

On November 24, 1994, Defendants contracted to sell cotton to Da Hua Non–Ferrous Metals Co., Ltd. ("Da Hua"), a Hong Kong company. Pursuant to the contract, the Masks shipped the cotton directly to Da Hua's buyer, Shandong Tong Wau Co. Ltd. ("Shandong"), a third party to the contract. Before the cotton reached Shandong, however, the Chinese Government embargoed the cotton at Quing Dao. Consequently, Shandong did not receive the shipment until late September, 1995, roughly a year after the Masks had shipped the cotton. Shandong determined that the cotton was inferior to the bargained for product and refused to accept the cotton. In response to Shandong's rejection, Da Hua shipped the cotton to its own facilities, and sent samples of the cotton for quality testing to SGS Services Inc., located in Memphis, Tennessee. SGS Services Inc. confirmed Shandong's assessment that the cotton was not raw cotton, but instead consisted of inferior re-ginned motes. Three days later, on November 24, 1995, in order to mitigate its losses Da Hua sold the shipment of cotton to a substitute buyer for a substantial loss.

During this time, the Masks participated in a program sponsored by the United States Agriculture Department ("USDA"), referred to as the "Upland Cotton" program. The Upland Cotton program issued certificates that provided subsidies to qualified exporters based on the grade and amount of cotton exported. One of the issues in the present case is whether the Masks misrepresented the quality of cotton to the USDA in their application for a subsidy for the Da Hua contract. Defendants maintain that the Government began its investigation of this matter at the end of 1995. The United States, however, contends that, though the Government conducted investigations of the Masks in 1995 and 1996, these investigations were separate and distinct from the investigation leading to the instant charges. From the information presented in the parties' briefs and at an oral hearing, the Court agrees with the United States that the investiga-

tion of the current matter did not begin until sometime after February 7, 1997.

For reasons undisclosed to the Court, sometime in 1995 several corporations pleaded guilty to conspiring to defraud the Upland Cotton program by splitting certificate payments. These companies had defrauded the USDA by receiving subsidies for exporting cotton that they never exported. In November of 1995, the USDA served nine warrants on various cotton exporters, including the Masks. The investigation did not focus upon the quality or quantity of the cotton exported, but on the collusion of exporters to engage in unlawful certification practices.

Towards the end of 1995 and into 1996, for reasons undisclosed to the Court, it came to the USDA's attention that the Masks had not shipped the full quantity of cotton called for by the contract between the Masks and Da Hua. Because the Masks had received governmental subsidies for the entire contracted amount, the USDA assessed the Masks with liquidated damages. The Masks appealed on November, 13, 1995. In 1996, the USDA National Appeals Division reversed the penalty, finding the Masks did not intend to defraud the USDA. Instead, the opinion states, "a dispute arose between [the Masks] and [Da Hua] regarding an alleged unacceptable quality for the first shipment of cotton," and that Da Hua had consequently refused to open up additional letters of credit. (Transcript, November 9, 2000 Hearing ("Tr.") 86). Defendants do not submit any evidence suggesting that the USDA suspected the Masks, at this time, of defrauding the USDA by exporting cotton that was substandard to the grade of cotton represented on the Masks's USDA application.

In February of 1997, Da Hua contacted Sandra Haste–Conner, Senior Special Agent of the USDA Inspector General's Office of Investigation ("Agent Conner").

Da Hua sent to Agent Conner the contracts between Da Hua and the Masks, Da Hua and Shandong, and Da Hua and its substitute buyer. Da Hua informed Agent Conner that it would send her samples of the cotton the Masks had shipped to Da Hua. After her initial review of the contracts, Agent Conner was unsure whether Defendants' actions ran afoul with any USDA regulations.

After receiving the cotton samples, however, Agent Conner discovered that the cotton sample's gin code number suspiciously matched up with cotton that had been sitting in a warehouse in Alabama *during* the time of shipment. Agent Conner spoke with Defendants' supplier, Performance Cotton. Representatives of that company stated that it sold re-ginned motes to Defendants, and that the shipment was intended for China. From this information, Agent Conner surmised that Defendants misrepresented to the Upland Cotton program the quality of cotton sent to Da Hua. On January 22, 1998, the United States issued a subpoena for Defendants' records. This subpoena requested documents relating to the sale of cotton to Da Hua, and formed the basis of the indictment leading to the present charges.

## II. Analysis

■■■ The statute of limitations provide defendants with their primary guarantee against stale charges. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) The Due Process Clause of the Fifth Amendment, however, independently plays a *limited* role in protecting against excessive pre-indictment delay. *Id.* at 789, 97 S.Ct. at 2048; *United States v. Brown,* 959 F.2d 63, 65 (6th Cir.1992). To offend due process, the delay must violate those fundamental conceptions of justice which lie at the base of our civil and political institutions. *Lovas-*

co, 431 U.S. at 790, 97 S.Ct. at 2049. Generally, a defendant can succeed on such a due process claim only if he or she can demonstrate (1) substantial prejudice to his or her right to a fair trial; and (2) that the delay was an intentional tactical ploy by the government. *Lovasco*, 431 U.S. at 789–90, 795, 97 S.Ct. at 2048, 2051; *United States v. Rogers*, 118 F.3d 466, 474–75 (6th Cir.1997). The burden to prove pre-indictment delay is on the defendant. *United States v. Beszborn*, 21 F.3d 62, 65 (5th Cir.1994).

Defendants initially ignore the two prongs of the test by asserting that the time span alone between contract formation and the issuance of the indictment constitutes a due process violation. The contract, which allegedly misrepresents the quality of the cotton to be exported, was signed by the parties on November 24, 1994. The Government indicted Defendants on November 18, 1999, one week before the statute of limitations was tolled. 18 U.S.C. § 3282. Accordingly, to show a due process violation under this theory, Defendants would in effect have to show that the statute of limitations period itself violates due process. Such a position is untenable, because a due process violation depends upon showing particularized facts to satisfy both prongs of the test, and is accordingly analyzed on a case by case basis. *United States v. Marion*, 404 U.S. 307, 324–25, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971).

### A. Substantial prejudice

■ Substantial prejudice is a necessary element to a due process violation for pre-indictment delay. *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048. There is real possibility of prejudice inherent in any extended delay: memories will dim, witnesses become inaccessible, and evidence may be lost. *Id.* at 788 n. 6, 97 S.Ct. at 2047; *Marion*, 404 U.S. at 325, 92 S.Ct. at 466. A defendant must show, however,

that delay led to the loss of the evidence, and that the particular evidence would have aided the defense. *United States v. Duncan*, 763 F.2d 220, 222–23 (6th Cir. 1985). Defendants must also show that evidence made unavailable by delay cannot be derived from alternative sources. *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997); *United States v. Beszborn*, 21 F.3d at 66–67. Finally, Defendants must make more than vague assertions that memories have been diminished, witnesses have been lost, and documents have been misplaced. *Beszborn*, 21 F.3d at 67.

### 1. Loss of time

■ Defendants contend that the United States's delay inherently prejudiced their ability to mount an effective defense. Delay itself, however, is not sufficient to show prejudice. *Marion*, 404 U.S. at 325–26, 92 S.Ct. at 466; *Duncan*, 763 F.2d at 222; *see, e.g., United States v. DeClue*, 899 F.2d 1465, 1468–69 (6th Cir.1990) (finding no prejudice for three-year delay); *United States v. Atisha*, 804 F.2d 920, 924–28 (6th Cir.1986) (finding no prejudice for an over two-year delay); *United States v. Brown*, 667 F.2d 566, 568 (6th Cir.1982) (finding no prejudice for a five-year delay).

### 2. Loss of physical evidence

Defendants assert that the Government's delay has resulted in the loss of physical evidence. First, Defendants contend that delay resulted in the parties not retaining samples of the cotton that the parties contracted to supply and buy. Defendants argue they are therefore prejudiced because they are unable to ascertain whether officials in Quing Dao tampered with the cotton shipment that eventually reached Da Hua. In its previous Order Granting Defendant's Motion for a Hearing on the Issue of Pre-indictment Delay, the Court found that the Government's

delay substantially prejudiced Defendants because the absence of such evidence contributed to the inability of the Masks to present a defense.

Second, Defendants argue that the cotton it shipped to Da Hua is unavailable due to investigatory delay. Defendants argue that the cotton's absence constitutes substantial prejudice because the cotton's alleged sub-standard quality is the basis for the fraud. Despite any prejudice Defendants may suffer because of the cotton's absence, Defendants fail to show that any investigative delay by the Government led to the cotton's unavailability. Da Hua sold the cotton in late November of 1995, several days after SGS Services, Inc. determined the cotton was sub-standard to the bargained-for-goods. There is no evidence, however, that the Government had initiated an investigation of the Da Hua transaction in 1995, when Da Hua sold the cotton to its substitute buyer. Therefore, Defendants cannot argue that the cotton's absence occurred because of investigatory delay when no investigation had been initiated on the matter.

Third, Defendants assert that warehouse tags and packaging for bales delivered to Da Hua are unavailable due to governmental delay. Defendants contend they are therefore prejudiced because they are unable to show that the samples tested by SGS Services were *not* in fact taken from the cotton shipped to Da Hua. Again, Da Hua mitigated its damages by promptly selling the below grade cotton. At this time, the Masks were not under investigation for the present matter. Therefore, the Masks have not shown that the unavailability of warehouse tags and packaging was caused by any governmental delay.

Fourth, Defendants assert records relating to the care of the cotton shipment during the Chinese embargo are unavailable due to pre-indictment delay. Defendants, however, fail to show that such records ever existed, and if they did, how investigatory delay could have led to their absence.

Finally, Defendants assert that cotton samples of the shipment received by Da Hua are old, and assert that the passage of time has compromised the sample quality. Assistant to the Associate Deputy Administrator of the Cotton Program, Donald West ("West"), who served for a time as the head cotton classer for the USDA, testified that he recently tested the quality of the cotton sample. West stated that the passage of time, in this case five years, does not affect the measurement of the cotton's strength or the staple length, but does affect measurement of color and trash content. The United States did not receive the sample until sometime in 1997. The record strongly suggests that the United States delayed in testing the cotton, despite its availability for testing. Defendants, however, do not assert that the sample is favorable to their case. Further, it is speculative as to how much the Government's delay compromised a cotton sample that was already two years old. Although the Court finds that the Masks were prejudiced by the Government's delay, they were not substantially prejudiced.

### 3. Loss of documents

Defendants next assert that governmental delay led to the unavailability of documents. First, Defendants alleged that delay led to the unavailability of the Masks' records relating to their purchase order of the cotton they sent to Da Hua, as well as their records which tracked all purchases and sales for the 1994 and 1995 crop season. Defendants assert that the records, now unavailable, included the gin bale numbers and gin bale tag list for cotton that the Masks had purchased and received from their suppliers. Agent Conner, however, maintains that the gov-

ernment has records as to cotton that Defendants' purchased and shipped to Da Hua, and Defendants do not rebut her testimony. Defendants have not shown how other records relating to purchases unrelated to the Da Hua transaction would be favorable to their case.

Second, Defendants contend that, due to the Government's delay, they were unable to request from the USDA records that would represent the quality of cotton purchased from the Masks' supplier. This information is stored on what is termed a "green card." Green cards are only issued for raw cotton. The United States argue that, because the USDA destroys green cards two years after the cotton is baled, the green cards were unavailable by the time the Government indicted Defendants. The record reflects, at the latest, Defendants purchased the cotton at the beginning of 1995. The USDA would therefore have destroyed the green cards by early 1997. Da Hua did not apprise Agent Conner of possible wrongdoing until February of 1997. Therefore, investigatory delay could not have caused the unavailability of the green cards when the government was not, at the time they were destroyed, in the process of investigating the Masks.

Defendants counter that the government knew of possible wrongdoing by 1996, as evidenced by the USDA National Appeals Division's opinion. The opinion states, "a dispute arose between the appellant and the buyer regarding an alleged unacceptable quality for the first shipment of cotton." (Tr. 86). The opinion therefore indicates that the USDA was aware that a dispute existed between Da Hua and the Masks as to the quality of goods shipped

to Shandong. Defendants, however, do not proffer any evidence showing that the USDA's knowledge of this dispute sparked any investigation of the Da Hua incident. Though the absence of the green cards may be prejudicial to Defendants,[1] there is no evidence suggesting their absence is a result of any governmental delay.

Finally, Defendants assert that a substantial number of documents, obtained by the grand jury, are now unavailable because the United States lost them. Defendants attach to their motion a letter from the U.S. Attorney indicating that indeed some documents were lost. The letter, however, indicates that FedEx lost the documents. Lapse of time has no bearing on whether or not FedEx will misplace documents. Certainly it becomes more probable that, with the passage of time, some documents left in a warehouse will be misplaced, a witness will leave the jurisdiction, or a memory will fade. But the passage of time makes it no more probable that, when a delivery service transfers documents, they will be lost. Defendants therefore fail to show how the Government's delay led to the loss of these documents.

### 4. Unavailability of witnesses

■ Defendants assert that delay resulted in the unavailability of two allegedly key witnesses involved in negotiating the contract between the Masks and Da Hua, Yah Lin "Charlie" Trie ("Trie") and Jennifer Russell ("Russell"), who have both relocated from Arkansas to foreign countries. The mere loss of witnesses due to the passage of time does not necessarily

---

1. The Government contends that green cards regarding the shipment to Da Hua were never available. Green cards are only issued for raw cotton, not re-ginned motes. The Government alleges that the cotton samples were re-ginned motes. The Government accordingly argues that, because Defendants alleged-

ly sold re-ginned motes to Da Hua, there was never a green card issued for the cotton purchased from Mask Cotton Co.'s supplier. The Government therefore argues that Defendants cannot claim to be prejudiced by the absence of green cards that were never in existence.

constitute prejudice. *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997). To show prejudice, a defendant must show that the witnesses would have aided the defense. *Lovasco*, 431 U.S. at 785, 97 S.Ct. at 2046. Further, the Court will only find prejudice if it is convinced that the witnesses would have testified, that the testimony would have withstood cross-examination, and that the jury would find the witnesses credible. *Rogers*, 118 F.3d at 475.

The Court notes that on August 29, 2000, Defendants moved to *oppose* the taking of Russell's deposition on foreign territory. Although Defendants proposed multiple reasons for their opposition, one reason was the questionable materiality of her testimony. Defendants pointed out that, though she worked for Daihatsu, the company that brokered the cotton contract at issue, her actual involvement in the contract was speculative. Defendants observed that on most of the 129 documents mentioning Russell's name, she was merely being sent a "cc". It is inconsistent for Defendants to argue that they are prejudiced by not having access to Russell when they previously argued that the materiality of her testimony was speculative. Likewise, Defendants fail to provide the Court with any specifics as to Trie's role in the transaction. Finally, Defendants fail to inform the Court when Trie and Russell relocated to foreign countries, frustrating any analysis as to whether the government's delay had an impact on the witnesses availability.

Although the hearing did not produce additional evidence of substantial prejudice, in accordance with the previous order, the Court finds that the Masks have been substantially prejudiced by the Government's pre-indictment delay. Defendants have therefore satisfied the first prong of the test. Defendants, however, fail to show that any pre-indictment delay was intentionally or recklessly devised to gain a tactical advantage over Defendants.

**B. Governmental intent**

 Defendants do not have a due process right to have an indictment returned immediately upon the government having obtained sufficient evidence of guilt. *United States v. Greene*, 737 F.2d 572, 575 (6th Cir.1984). The Sixth Circuit has consistently held that dismissal for pre-indictment delay is warranted only when the defendant shows that the delay was an intentional device by government to gain a tactical advantage. *United States v. Brown*, 959 F.2d 63, 66 (6th Cir.1992) (*citing United States v. Brown*, 667 F.2d 566, 568 (6th Cir.1982) (per curium); *United States v. Lawson*, 780 F.2d 535, 541 (6th Cir.1985) (per curium)); *Greene*, 737 F.2d at 574. Two Sixth Circuit decisions suggest that a lesser showing of governmental culpability may still be sufficient to trigger a due process violation. *See, e.g., United States v. Alred*, 513 F.2d 330, 331 (6th Cir.1975) (holding that an unexplained pre-indictment delay with prejudice could result in a due process violation); *United States v. Giacalone*, 477 F.2d 1273, 1276–77 (6th Cir.1973). These decisions, though not explicitly overruled, are undermined by subsequent Sixth Circuit opinions and the Supreme Court's decision in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In *Lovasco*, the Court took pains to underscore the importance of preserving a prosecutor's discretion in deciding when to issue an indictment. *Id.* at 2049–2051. From the government's perspective, for the Court to exert too much pressure on a prosecutor to indict may result in the wasting of scarce resources and result in an incomplete investigation; and from a suspect's perspective, doing so may result in overzealous and unjustified law enforcement action.

■ Additionally, due process violations traditionally require a higher degree of culpability than governmental negligence. *See Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (applying standard of care in due process violation brought under 42 U.S.C. § 1983). The Court in *Lovasco* acknowledged the government's concession without objection that a due process violation may occur where the government delays an investigation in reckless disregard of circumstances that suggest such delay will impair the defendant's ability to mount an effective defense. *Lovasco,* 431 U.S. at 796 n. 17, 97 S.Ct. at 2051. Therefore, case law suggests that the defendant must show that delay was intentional, and at the very least, reckless, and that the delay was designed to gain a tactical advantage.

■ The Due Process Clause, however, does not permit courts to dismiss criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. *Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2049. Additionally, the government's stated reasons for a delay must be taken in good faith. *Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2052. The defendant, however, may rebut the government's explanation for the investigative delay. *United States v. Atisha,* 804 F.2d 920, 928 (6th Cir.1986).

■ In the present case, the United States disagrees with Defendants' position that the Government started its investigation in December, 1995. The United States contends that the 1995 subpoena was aimed at investigating Defendants involvement with dividing payments with other cotton exporters, and that it started its investigation of the present case in 1997. Defendants do not rebut the Government's assertion. Defendants, however, claim that USDA officials knew about Defendants alleged substandard shipment as early as 1996, citing to the USDA National Appeals Division's opinion that reversed the fine levied against the Masks. As discussed, the opinion stated that "a dispute arose between the appellant and the buyer regarding an alleged unacceptable quality for the first shipment of cotton." (Tr. 86). Defendants also elicited testimony from Agent Conner that all USDA divisions are required to provide the Inspector General's Office information concerning a suspected crime.

The Court finds, however, that while the USDA's hearing officer might have been negligent in failing to recognize that such information may lead to a suspected crime, his failure to report such information to the IGO does not, by itself, reflect any ill intent or recklessness. Moreover, there could be many reasons why a dispute between two contracting parties may arise as to the quality of goods. Such a dispute does not automatically cast a sinister shadow over the supplier.

Defendants also assert that the United States delayed issuing an indictment in order to "hold a hammer" over Defendants' heads. According to Defendants, such tactics were intended to force Defendants to provide information to the government regarding Charlie Trie, who was under investigation for illicit campaign donations to United States President Bill Clinton. Agent Conner, however, testified that the two agencies coordinated resources because "they had some of the documents that we needed ... and that's why I had contacted them." (Tr. 94). Agent Conner's testimony suggest that nothing more than an exchange of information occurred between herself and the FBI.

The Court finds the United States' position credible that it did not start investigating the Masks for matters involving the current indictment until 1997. In addition, the Court does not find that the inter-

agency cooperation revealed evidence of an effort to gain a tactical advantage over Defendants.

### III. Conclusion

Despite finding that the Masks were substantially prejudiced by pre-indictment delay, the Court does not find that any delay was intentionally devised to gain a tactical advantage. Defendants have not shown that fundamental conceptions of justice have been offended. The Court finds no due process violation on the basis of pre-indictment delay. Accordingly, the Court **DENIES** Defendants' motion to dismiss for pre-indictment delay.